UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESUS P., | |
| Plaintiff, | |
| | Case No. 19 C 2271 |
| v. | |
| | Magistrate Judge Sunil R. Harjani |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jesus P. challenges the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties filed cross-motions for summary judgment [11, 20]. Because the ALJ's decision is supported by substantial evidence, Plaintiff's Motion for Summary Judgment [11] is denied, the Commissioner's Motion for Summary Judgment [20] is granted, and the ALJ's decision is affirmed.

## BACKGROUND

Jesus suffered a heart attack in 2008 and required a pacemaker implantation and stent placements. Jesus also has a history of ulcerative colitis ("UC"), which was initially diagnosed in the 1990s. In August 2016, Jesus filed for DIB alleging disability since May 19, 2010 due to his use of a pacemaker, diabetes, UC, fatigue, and chest pain. At the January 9, 2018 hearing before the ALJ, Jesus amended his alleged onset date to March 23, 2015. Jesus was born on January 2, 1965 and thus was 50 years old on his amended alleged disability onset date.

Jesus testified at the hearing that he completed seventh grade and never received his GED. He has his driver's license and is able to drive. Jesus last worked for Best Buy in May 2010 as a

warehouse supervisor. His prior work experience also includes work as a forklift operator. Jesus previously filed a claim for DIB which was denied by ALJ Roxanne J. Kelsey on March 5, 2013. (R. 129-41). That decision is final and binding. *Id*. at 337, n.1.

On April 27, 2018, ALJ Karen Sayon issued a decision denying Jesus's DIB claim. (R. 21-31). Following the five-step sequential analysis, the ALJ found that Jesus had not engaged in substantial gainful activity from his amended alleged onset date of March 23, 2015 though his date last insured of December 31, 2015 (step 1) and that he suffered from the severe impairments of diabetes mellitus, ulcerative colitis, and coronary artery disease with myocardial infarction in 2008 and a pacemaker implantation in 2008. *Id*. at 23. Further, the ALJ determined that Jesus's lumbar and thoracic degenerative changes were not severe impairments. *Id*. at 24. The ALJ then determined that Jesus's impairments did not meet or equal the severity of a list impairment (step 3). *Id*. at 24-25. The ALJ next found that Jesus retained the RFC to perform light work except that he: could occasionally climb and must avoid concentrated exposure to temperature extremes, humidity, vibration, respiratory irritants, or hazards, defined as work at heights or around dangerous moving machinery like a forklift. *Id*. at 25-30. At step 4, the ALJ concluded that Jesus was unable to perform any past relevant work. *Id*. at 30. Given the RFC, at step 5, the ALJ determined that Jesus could perform other jobs identified by the VE including packer, assembler, and sorter. *Id*. at 30-31. Based on this step 5 finding, the ALJ found that Jesus was not disabled. *Id.* at 30. The Appeals Council denied Jesus's request for review on January 28, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-8; *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## DISCUSSION

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano*, 556 F.3d at 562; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must

nevertheless "build an accurate and logical bridge" between the evidence and her conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Jesus raises three main arguments in support of his request for reversal. He first argues that the ALJ failed to consider the entire longitudinal record in formulating his RFC. Jesus also contends that the ALJ improperly discounted his subjective symptom statements. Jesus last argues that the ALJ erred in assessing the medical opinion evidence. None of these arguments demonstrates that the ALJ's decision was not supported by substantial evidence or that the ALJ committed any error.

A.      **RFC Assessment**

Jesus argues that in assessing his RFC, the ALJ erred by failing to consider evidence of his significant limitations both prior to and after the relevant period. "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). Jesus alleged disability beginning on March 23, 2015 and his date last insured ("DLI") was December 31, 2015, meaning that he had to show disability prior to that date in order to receive DIB benefits. *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009) ("[A] claimant must show that the disability arose while he or she was insured for benefits."). Consequently, the parties agree that the relevant time period in this case is between March 23,

2015 and December 31, 2015. Doc. 12 at 8, n. 3; Doc. 21 at 2; *see McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018).

Jesus accuses the ALJ of "[t]reating the period between the onset date and the date last insured as if it were a fantastical 'impairment-free zone'" and improperly ignoring the full context of the longitudinal record. Doc. 12 at 8. Jesus is mistaken. The ALJ stated that she considered "all the evidence," but she appropriately focused her discussion on evidence during the relevant time period. (R. 21, 26). She determined that Jesus was not disabled at any time from the March 23, 2015 amended alleged onset date through the December 31, 2015 DLI because the "medical evidence from this period does not show any particularly compelling findings" and Jesus "was repeatedly noted to be doing fine with no or minimal complaints." *Id*. at 26.

The objective medical evidence supports the ALJ's conclusion in this regard. Jesus was diagnosed with UC in the 1990s but was able to work despite that condition until May of 2010. His UC was stable with no medications for many years. (R. 134). Beginning in mid-2009, Jesus began treating with gastroenterologist Stephen Grill, M.D., due to abdominal pain and diarrhea. *Id*. Since then his UC has been relatively stable and well-controlled with treatment. Jesus was hospitalized in July 2010 for a flare-up of his UC, but he improved with medications. *Id*. at 417-29, 563. By August 16, 2011, Jesus's UC was "in remission" and he continued in remission until July 3, 2016, six months after his DLI. *Id*. at 514; *see also id*. at 445, 450, 455, 459, 469, 473, 479, 484, 489, 494, 499, 504, 509 (noting "UC in remission" and the "symptoms are stable" on 12/29/2011, 5/21/2012, 10/16/2012, 1/16/2013, 4/17/2013, 7/17/2013, 10/17/2013, 1/23/2014, 4/23/2014, 11/10/2014 and not reporting abdominal pain, change in bowel habits, diarrhea, and stool incontinence on 5/15/2015, 8/20/2015, and 11/20/2015). On July 3, 2016, Jesus was hospitalized for a UC flare "precipitated by lack of medication after losing his insurance." *Id*. at

862. Jesus was treated with IV medications and discharged on July 10, 2016. *Id*. at 840-42. On July 18, 2016, it was noted that Jesus was doing well since his discharge and by September 8, 2016, his UC was "in clinical remission." *Id*. at 833, 859.[1]

After the July 2016 flare and continuing well beyond his date last insured, Jesus's UC remained stable and in clinical remission: denied diarrhea and "UC stable on meds" on November 2, 2016 (R. 1222); reported no abdominal pain, change in bowel habits, diarrhea, or stool incontinence on November 3, 2016 (*id*. at 1166); problem list included "ulcerative colitis without complications" on December 14, 2016 and February 21, 2017 (*id*. at 1213, 1216); "no complaints" and reported no abdominal pain, change in bowel habits, diarrhea, or stool incontinence on February 22, 2017 (*id*. at 1160-61); "last flare 7/2016, otherwise well controlled on AZA and

---

[1]     Jesus accuses the ALJ of misconstruing the meaning of "clinical remission." Doc. 12 at 12-13. In support, Jesus cites a recent article describing how "remission" can have more than one meaning in the context of UC. *Why Clinical Remission is Not the Goal in IBS*, https://www.verywellhealth.com/what-is-clinical-remision-in-ibd-4119331 (Dec. 1, 2019). According to the article, "it's increasing being understood that remission should include more than controlling symptoms. Getting to what's called 'deep' remission is now the goal." *Id*. This is because even when in "clinical remission," the "IBD could still be causing inflammation in the digestive tract." *Id*. Citing the article, Jesus points out that inflammation puts the patient at increased risk for various other poor outcomes, such as relapse of UC, a higher risk of surgery, and more long-term problems such as an increased risk of colon cancer." Id. at 12-13. Thus, the goal of treatment is "deep remission" where there is not inflammation present in the digestive system. Jesus argues that without evidence of "deep remission," the ALJ minimized the impact of his chronic UC. Doc. 12 at 13. Jesus's point is not well-taken. As the Commissioner argues, whether Jesus was in "deep remission" or merely had his symptoms controlled by medication is irrelevant in this context. The relevant question is whether Jesus's UC causes functional limitations that rendered him unable to work during the relevant time period. The absence of evidence of "deep remission" does not undermine the ALJ's RFC finding. Even if some persons in clinical remission may experience inflammation which increases the risk for poor outcomes, this does not mean that Jesus suffers from any of the serious complications listed in the article he cites. Jesus bears the burden of demonstrating from the record evidence that his UC was disabling during the critical period prior to his date last insured. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability."); *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability."). Jesus cites no medical evidence suggesting that he suffered from any serious UC complications or other poor outcomes during the relevant period, and thus, the ALJ reasonably concluded that "there were no flares during the critical period at issue." (R. 27). Moreover, fails to cite any medical or opinion evidence indicating that his UC resulted in any functional limitations greater than those included in the ALJ's RFC determination. *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error.").

pentasa" on March 15, 2017 (*id*. at 1092); reported "about 3 bowel movements solid brown without blood" with "no fever/chills, diarrhea, abdominal pain, jaundice, joint pains, skin rash" such that Jesus's UC was deemed in "clinical remission" on March 28, 2017 (*id*. at 1108-09); complained of bilateral feet pain but no fever, chills, nausea, vomiting, or diarrhea on May 22, 2017 and May 23, 2017 (*id*. at 1155-56, 1208); "denie[d] new complaint" and problem list included "ulcerative pancolitis without complications" on August 1, 2017 (*id*. at 1205, 1207); reported no abdominal pain, change in bowel habits, diarrhea, or stool incontinence on August 22, 2017 (*id*. at 1152); stated "doing well with 3-4 BM/day (in clinical remission)," "denie[d] any abdominal pain or blood in stool," complained of "cramping pain, no radiating that resolves with bowel motion. Eating well, no weight loss" on September 28, 2017 (*id*. at 1134, 1138); noted "challenged with UC which is a problem for him" on December 1, 2017 but reported no abdominal pain, diarrhea, or stool incontinence on December 6, 2017 (*id*. at 1149, 1239).

Moreover, the ALJ correctly found that during the relevant period, Jesus's treatment records from his endocrinologist indicate that his diabetes did not result in any symptoms and he reported good blood sugar readings, despite high A1C levels. (R. 26). There is no indication in the medical record of diabetes-related complications or limitations prior to the amended alleged onset date of March 23, 2015 and during the relevant period. *Id*. at 489 (4/17/2013: "No complaints, FBG=130" and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 484 (7/17/2013: "BG in AM=90-120" and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 479 (10/17/2013: "FBG=90-120, no complaints, HbA1C=6.5" and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 473 (1/24/2014: "BG is good, no complaints" and "diabetic nephropathy remains stable. Will not

change medication, continue to monitor for complications.); *id*. at 469 (4/23/2014: "No complaints" and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 465, 467 (7/23/2014: HbA1C=7.7 and no paresthesias); *id*. at 459 (11/10/2014: HbA1C=7.3 and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 454 (5/15/2015: "FBG=100-120 in AM" and "diabetic nephropathy remains stable. Will not change medication, continue to monitor for complications."); *id*. at 449 (8/20/2015: "No complaints, HbA1C=7.6."); *id*. at 444, 447 (11/20/2015: "FBG is 105, improved after meals BG" and "HbA1C=7.4."). Even after the DLI, on November 2, 2016 and February 21, 2017, Jesus's primary care physician indicated that his diabetes was "well controlled" and continued his current medication. *Id*. at 1213, 1222; *see also* (R. 1160, 1162) (2/22/2017: reporting "[n]o complaints" to endocrinologist and HbA1C=7.6). The ALJ further noted that Jesus "did not make any significant complaints of neuropathy until early 2017, which is well after the date last insured." *Id*. at 26; *see id*. at 1148, 1155, 1208, 1214, 1216.

The ALJ also accurately noted Jesus had a history of heart problems prior to his amended alleged onset date, but he repeatedly denied cardiac symptoms, reported regular exercise, and was found to be doing well in the treatment records from his cardiologist just prior to his amended alleged onset date and during the period at issue. (R. 656, 658) (2/24/2014: "Going to gym. Feels fine. No problems." and "Doing fine."); *id*. at 649, 650 (8/25/2014: "Feels good. No complaint. Goes to gym. . . . Feels just fine. No complaints."); *id*. at 641 (3/2/2015: "No problems" and reports regular exercise); *id*. at 629 (9/3/2015: "Doing fine. No symptoms. Exercises regularly. No CP or SOB."). The ALJ discussed Jesus's March 2015 stress test which showed "excellent exercise tolerance," but the results were uninterpretable due to the development of a paced rhythm during the study so "clinical correlation [wa]s required." *Id*. at 28, 364. However, as the ALJ

noted, a follow-up myocardial perfusion imaging study showed no evidence of ischemia. *Id*. at 28, 366.  The ALJ also noted that Jesus was examined by an electrophysiologist during the relevant time period for cardiac management. *Id*. at 28-29.  On August 25, 2015, the electrophysiologist noted that Jesus: reported regular exercise and no substernal chest pain or dyspnea on exertion; had a regular heart rate and rhythm, normal palpations, and no deformities; and needed a new pacemaker generator in December 2015. *Id*. at 28, 632-34; *see also id*. at 645-47 (2/24/2015: reported regular exercise, denied substernal chest pain or shortness of breath, and normal palpitations and no deformities found); *id*. at 622-24 (12/8/2015: stated "going to Mexico for part of the winter," reported regular exercise, denied substernal chest pain, and normal palpitations and no deformities found).  The ALJ correctly noted that Jesus's treatment notes showed only one complaint of shortness of breath prior to his amended alleged onset date which occurred while jogging, but he was able to do other exercises and there was no evidence of worsening in 2015. *Id*. at 27; *id*. at 669 (7/29/2013: "He complains of dyspnea on exertion, but denies chest pain, orthopnea, edema, and claudication. . . . Able to ride bike and walk at health club without difficulty.").

Finally, the ALJ found that obesity was a severe impairment, but properly noted that Jesus's "weights from the period at issue mainly resulted in BMIs in the upper 20s, though he did reach a BMI of 30 at least once." (R. 26-27) (11/1/2014: 193.5 pounds; BMI 30.3); *id*. at 450 (8/20/2015: 188 pounds; BMI 28.59); (11/20/2015: 187 pounds; BMI 28.43); (12/8/2015: 189.25 pounds, BMI 28).  As the ALJ noted, two years post the DLI on December 12, 2017, Jesus weighed 192 pounds and his BMI was 29.30. *Id*. at 28, 1233.  A BMI of 30 is at the lowest end of the obesity range, and Jesus does not identify any evidence in the record indicating that his obesity affected his functioning or ability to perform work activities. *Hernandez v. Astrue*, 277 F. App'x 617, 624

9

(7th Cir. 2008) (claimant "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do.").

Jesus is correct that the ALJ must consider all relevant evidence in the record. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) ("The RFC assessment must be based on *all* of the relevant evidence in the case record."); *see also* 20 C.F.R. § 404.1545(a)(1). Evidence that pre-dates his amended alleged onset date and post-dates the DLI may be probative to the extent it sheds light on the nature and severity of his condition during the relevant period. *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (ALJ's failure to explicitly address treating physician's opinions about claimant's ability to work rendered two and three years prior to the alleged onset date was reversible error); *Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012) (rejecting government's argument that post-DLI evidence is irrelevant); *Million v. Astrue*, 260 F. App'x 918, 922 (7th Cir. 2008) (explaining that post-DLI medical records were "relevant only to the degree that they shed light on [the claimant's] impairments and disabilities from the relevant insured period"); *Johnson v. Sullivan*, 915 F.2d 1575, at *3 (7th Cir. 1990) ("[T]he ALJ should consider the record as a whole, including pre-onset evidence (particularly relating to a degenerative condition) and post-onset evidence."); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time period subsequent to a certain period is relevant to a determination of claimant's condition during that period.").

Jesus claims that the ALJ ignored evidence of significant limitations prior to the relevant period, but he points to no medical records prior to his amended alleged onset date of March 23, 2015 that the ALJ failed to consider. In any event, the ALJ did not ignore pre-onset evidence and made specific reference to evidence prior to March 23, 2015 in assessing Jesus's RFC. *See* (R. 26) (ALJ noting that Jesus "reported good blood sugar readings to his primary care physician in

November 2014, which is just before the amended alleged onset date"); *id*. at 27 (ALJ noting Jesus "had a history of heart problems prior to his amended allege onset date" but in 2013, he "was exercising at a gym"); *id*. (ALJ noting Jesus complained one time of dyspnea while jogging in July 2013, "but he was able to do other exercises at the gym, like walking and riding a bike without problems" and there is "no evidence of worsening in 2015"); *id*. (ALJ noting that prior to July 2016, Jesus's last prior UC flare was in 2012 or 2013); *id*. (ALJ noting that during a medical appointment in November 2014, Jesus's symptoms for his ulcerative colitis were stable); *id*. at 28 (ALJ noting that Jesus's BMI was 30.3 in November 2014).

The ALJ also explicitly addressed medical evidence that post-dates the relevant period, including most of the items of evidence cited in Jesus's brief. *See* (R. 26) (ALJ noting that Jesus did not "make any significant complaints of neuropathy until early 2017, which is well after the date last insured."); *id*. at 27 (ALJ noting Jesus had a UC flare in "July 2016 (which is after the date last insured), when he was out of all of his medications as he had lost his insurance."); *id*. (ALJ noting that "in March 2017 (when [Jesus] did start seeing a specialist) that his last colonoscopy had been 8 years ago. These records note that the claimant's ulcerative colitis is in remission, with a baseline of three to four well-formed BMs per day."); *id*. at 28 (ALJ noting that "[a]fter the relevant period for alleged disability, it was noted during a medical appointment in March 2017, that the claimant's ulcerative colitis was in clinical remission and he was taking Azathioprine and Pentasa for treatment."); *id*. (ALJ noting that a "few years after the relevant period for alleged disability, it was noted during a letter dated December 12, 2017, that the claimant was 68 inches tall, and he weighed 192 pounds and his BMI was 29.30.").

The ALJ did not explicitly discuss Jesus's abnormal electrocardiogram and receipt of a new pacemaker on November 29, 2016, eleven months after the DLI. However, an ALJ is not

required to address every piece of evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). An ALJ need only "minimally articulate" her reasoning so as to build an accurate and logical bridge from the evidence to her conclusions. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Although the ALJ did not specifically cite Jesus's November 2016 electrocardiogram results and new pacemaker, the ALJ did consider Jesus's cardiac management appointments during the relevant time period. (R. 28-29). As the ALJ noted, on August 25, 2015, Jesus's physical examination revealed a regular heart rate and rhythm and no deformities. *Id.* at 28, 634. He experienced no substernal chest pain or dyspnea on exertion, and it was noted that he would need a new pacemaker generator in approximately five months. *Id.* The ALJ further noted during his cardiac management appointment on September 3, 2015, Jesus reported that he was "[d]oing fine," exercised regularly, and had no chest pain, shortness of breath, or other symptoms. *Id.* at 28, 629. After physical examination, Jesus's cardiologist noted that Jesus was "doing well" and had no angina and no ischemia. *Id.* at 28, 630. It was also noted that his pacemaker would be changed in December 2015. *Id.* As the ALJ observed, Jesus's physical examination on December 8, 2015 revealed no deformities with his heart and he had normal palpations. *Id.* at 28, 624. He also denied substernal chest pain. *Id.* at 624. It was noted that his pacemaker was functioning well. *Id.* at 29, 624. Jesus does not explain how the abnormal electrocardiogram and new pacemaker implantation in November 2016 evidence bears on whether he was disabled during the relevant period and supports greater limitations than those found by the ALJ. In fact, as Jesus notes, the November 2016 electrocardiogram revealed "no significant change since an ECG performed in October 2011." Doc. 12 at 4; (R. 984). Moreover, on December 6, 2016, after the new pacemaker implantation, Jesus had a device check visit and it was noted that his pacemaker had normal function and a good

battery with an estimated longevity of 10.5 years. (R. 873). Based on the foregoing, the Court concludes that ALJ's discussion of Jesus's heart condition was sufficient and more than satisfies the minimal articulation standard.

Jesus cites *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), in support of his argument that "when the date last insured predates the hearing, the ALJ must first determine whether [a claimant's] ailments are, at the time of the hearing, totally disabling." Doc. 12 at 8. Relying on *Parker*, Jesus contends that "in determining whether a claimant is disabled during the relevant period, the ALJ must consider *all* relevant evidence, including the evidence regarding plaintiff's condition prior to and subsequent to the relevant period," and "should retain a medical expert to help determine the extent of a Plaintiff's limitation" during the relevant period. *Id.*

In *Parker*, the ALJ found "the claimant's psychiatric problems and treatment all surfaced after" the DLI. *Parker*, 597 F.3d at 924. The Seventh Circuit held the ALJ's analysis deficient because the ALJ failed to explain his prior contradictory finding that as of the DLI, plaintiff was suffering from depression and post-traumatic stress disorder. *Id.* The *Parker* court found the plaintiff's symptoms consistent with post-traumatic stress disorder but noted that even if she was totally disabled by 2005, she had to prove she was totally disabled by March 2004, her date last insured. *Id.* The Seventh Circuit reversed the ALJ's decision for failing to consider evidence of the plaintiff's medical conditions after her last insured date because that evidence might show she was previously disabled. To that end, the ALJ "should either have determined whether the plaintiff's ailments are at present totally disabling, and, if so, have retained a medical expert to estimate how grave her condition was in March 2004, the last date before her coverage expired; or the judge should have determined directly whether the plaintiff was totally disabled by then—but

in making that determination he must (as under the first approach) consider *all* relevant evidence, including the evidence regarding plaintiff's condition at present." *Id.* at 925.

The Court finds no error in this case under *Parker*. Unlike in *Parker*, the record here shows that the ALJ did consider evidence post-dating Jesus's DLI, as well as evidence pre-dating his alleged amended onset date, and concluded that Jesus was not disabled during the pre-DLI period. The record also contained contemporaneous treatment records from the relevant time period that sufficiently support the ALJ's conclusion that Jesus was not disabled prior to his DLI. The ALJ further considered the unrebutted opinions of the state agency medical consultants who issued their opinions in November 2016 and February 2017, after Jesus's DLI of December 31, 2015. (R. 29). And, she correctly noted that no treating or examining physician found Jesus's conditions disabling or even that he had limitations greater than those determined by the ALJ. *Id.* Jesus has not explained how the medical evidence post-dating his DLI suggests that he is currently disabled or was disabled at any time prior to December 31, 2015. Because the ALJ determined directly whether Jesus was totally disabled by the DLI after considering all the relevant evidence, including the evidence regarding Jesus's post-DLI condition under the second *Parker* approach, the ALJ did not need to retain a medical expert to estimate how grave his condition was in December 2015.

Jesus next argues that the ALJ failed to account for all of his limitations in combination when assessing his RFC. According to Jesus, had "she properly considered all of [his] limitations, in combination, the ALJ could not possibly have determined that [he] was capable of sustaining any full time competitive work." Doc. 12 at 10. The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). A "regular and continuing basis" means the ability to work "8 hours a day, for 5 days a week, or an equivalent

14

work schedule." *Id.* "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). However, the ALJ need only include restrictions in the RFC that are "supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011).

Jesus contends that the ALJ did not fully consider the impact of his UC related symptoms on his ability to sustain full-time work. The Court disagrees. Relying on his own testimony from the hearing, Jesus states that he "has to travel with bags and buckets in case an urgent need to have a bowel movement arises. It is bad enough that he has to take these precautions when he is alone in a car; in a workplace, no amount of buckets and bags would keep [him] from running to the bathroom constantly, if only to avoid the humiliation of an accident." Doc. 12 at 11. The vocational expert testified that employers generally accommodate an absenteeism rate of one and a half days per month and up to 15 percent off-task time that can be used for bathroom breaks outside of regular break times. (R. 98-99). If an individual required more than 15 percent off-task time for additional bathroom breaks during the course of a workday outside of regular break times, no jobs would be available to such an individual without special accommodation. *Id.* at 99. Jesus faults the ALJ for not imposing an RFC restriction allowing him extra bathroom breaks.

The ALJ adequately considered the symptoms of Jesus's UC when setting his RFC. Specifically, the ALJ noted that Jesus had a UC flare in July 2016, more than six months after his DLI, when he had lost his insurance and was out of all of his medications. (R. 27). At that time, Jesus reported that his last prior flare had been 3-4 years prior. *Id.* In August 2016, Jesus indicated that prior to his July 2016 flare, he had been on Remicade for his UC since 2013 and had only had one flare since 2013. *Id.* at 829. Thus, the ALJ reasonably found that the record failed to document

any UC flares during the relevant period. *Id*. at 27. Further, Jesus never mentioned a need to take frequent and unscheduled bathroom breaks to his treating doctors during the relevant time period. As noted above, Jesus did not complain of abdominal pain, change in bowel habits, diarrhea, stool incontinence, or any other adverse symptoms of UC during office visits on May 15, 2015, August 20, 2015, and November 20, 2015 and reported that his Remicade treatment for his UC was working well on February 24, 2015 and August 25, 2015. *Id*. at 445, 450, 455, 634, 645, 647. Jesus fails to cite to any medical evidence indicating that he needs bathroom breaks in addition to normal breaks and the 15 percent off-task time during a workday. Relying on the VE's testimony, the ALJ concluded that Jesus's physical impairments limited him to light work involving only occasional climbing and certain environmental limitations with no special accommodation for additional bathroom breaks. *Id*. at 25. These restrictions tracked the uncontested conclusions of the state agency physicians, who considered the aggregate effect of Jesus's impairments and found that he could sustain a limited range of light work with the same postural and environmental limitations on a sustained and full-time basis. *Id*. at 108-10, 119-22.

**B.      Symptom Assessment**

Jesus next argues that the ALJ improperly discounted his subjective symptom statements. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510. An ALJ must justify his subjective symptom evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course

of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted).

The ALJ considered Jesus's subjective symptoms allegations but found them "not entirely consistent with the medical evidence and other evidence in the record." (R. 26). Jesus argues that the ALJ did not adequately accommodate his symptoms of overwhelming fatigue and frequent need for urgent bathroom breaks in her RFC assessment. Jesus's argument is unconvincing. The ALJ provided several specific and legitimate reasons supported by substantial evidence in the record for not fully crediting Jesus's subjective symptom statements. First, the objective medical evidence and Jesus's daily activities did not corroborate his subjective symptom statements. SSR 16-3p, 2017 WL 5180304, at * 5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."); *Jeske v. Saul*, 2020 WL 1608847, at *8 (7th Cir. Apr. 2, 2020) ("agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."). As already noted, the ALJ properly found that "the medical evidence from this period does not show any particularly compelling findings" and Jesus "was repeatedly noted to be doing fine with no or minimal complaints." *Id*. at 26. The medical evidence from the relevant period fails to document complaints of any fatigue or frequent symptoms of active UC. *Id*. at 445, 450, 455 (did not report fatigue, abdominal pain, change in bowel habits, diarrhea, and stool incontinence on 5/15/2015, 8/20/2015, and 11/20/2015); *see Schmidt v. Barnhart*, 395 F.3d 737, 745–46 (7th Cir. 2005) ("the ALJ was correct in noting that

17

there is no objective support in the medical records for Schmidt's contention that he suffers from IBS-related fatigue. Further, Schmidt never even subjectively reported fatigue as a symptom to any of the physicians whose reports were made part of the record.").

In addition to the medical record, the ALJ cited Jesus's daily activities, including caring for his personal needs, doing laundry, going out alone, regularly exercising, driving, and going to church on Sundays. (R. 26-28). Jesus also testified that he traveled by car to Mexico in early 2015. *Id*. at 90. Jesus suggests that the ALJ should have explained why these "basic activities are inconsistent with deficits in standing, walking, climbing, and lifting" and that her failure to do so improperly equates those activities with an ability to work full-time. Doc. 12 at 12. The ALJ did not improperly equate Jesus's activities with full-time work. Rather, the ALJ considered these activities of daily living and reasonably concluded that they failed to show disabling symptoms. *Burmester*, 920 F.3d at 510 ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules."); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) ("[I]t is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated.").

Additionally, the ALJ found that Jesus's testimony about his urgent and unpredictable bathroom breaks not consistent with his own reports of his functioning during the relevant period. For example, as the ALJ noted, Jesus "repeatedly told his cardiologist that he felt fine and had no problem with his ulcerative colitis." (R. 27); *see id*. at 656 (2/24/2014: "Going to gym. Feels fine. No problems."); *id*. at 649 (8/25/2014: "Feels good. No complaint. Goes to gym. Takes Remicade

for UC. Feels just fine. No complaints."); *id*. at 641, 643 (3/2/2015: "No problems. No blood in stool. See GI as needed. Taking Remicade."); *id*. at 629 (9/3/2015: "Doing fine. No symptoms. Exercises regularly."); *see also id.* at 661 (2/4/2014: "doing well on Remicade"); *id*. at 645, 647 (2/24/2015: "Remicade for UC working well" and "on IV Remicade doing well"); *id*. at 634 (8/25/2015: "Remicade doi[n]g well."). The ALJ also observed that during the relevant period, Jesus "repeatedly told his doctors that he was doing well with no or minimal complaints." *Id*. at 30. The ALJ was entitled to discount Jesus's symptom allegations because they were inconsistent with his contemporaneous reports to his physicians within the relevant time period. *See Murphy v. Berryhill*, 727 F. App'x 202, 207 (7th Cir. 2018) (ALJ's adverse credibility finding was "properly based on the incongruity between the relatively modest symptoms [claimant] reported to her doctors and the more severe symptoms [claimant] ... reported to the ALJ."); *Cohen v. Astrue,* 258 F. App'x 20, 26 (7th Cir. 2007) (fact that claimant's "hearing testimony contradicted her contemporaneous reports to physicians and their independent observations ... is a legitimate basis for affording little weight to her testimony").

Consistent with Jesus's own reports to his physicians that he was doing well, the ALJ found that Jesus's "medications have been relatively effective in controlling [his] symptoms," which is a valid reason to discount his subjective symptoms. (R. 29); *see Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (affirming ALJ's credibility determination where claimant's "testimony that her sleeping disorder prevented her from working was inconsistent with her testimony that . . . medication kept it under control."); *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) ("[T]he ALJ noted that Donahue relied for pain control on over-the-counter analgesics and reported that these gave him good relief, from which the ALJ inferred that the level of pain could not be severe."). Contrary to Jesus's contention, the ALJ did not rely on instances of improved

A1C levels in rejecting the full range of claimed limitations caused by his diabetes. Rather, she reviewed the medical record generally, noting among other things, evidence of improved A1C levels in May and August 2015. (R. 27). She found, however, that despite documented high A1C levels by Jesus's endocrinologist from the critical period, he "repeatedly denie[d] symptoms and report[ed] good sugar readings." *Id*. Given all of these adequate reasons supported by the record for discounting Jesus's allegations of limitations, the ALJ's subjective symptom assessment was not patently wrong.

## C. Opinion Evidence

Jesus last argues that the ALJ erred in giving great weight to the opinions of the state-agency reviewing physicians, Drs. Bharati Jhaveri and Prasad Kareti. Drs. Jhaveri and Kareit issued their opinions in November 2016 and February 2017, respectively, both well after the DLI. (R. 103-12, 114-24). The state-agency physicians considered the evidence from May 19, 2010, the original onset date that Jesus alleged when he first filed his application for benefits through the evidence that had been introduced in late 2016. *Id*. Both doctors noted that they reviewed the evidence of Jesus's UC treatment in 2016, including the evidence about his July 2016 UC flare and hospitalization, and noted that the flare occurred when he had gone off his medications. *Id*. at 109, 121. Thus, the state-agency doctors made clear that they considered the evidence from both well before and well after the relevant period when opining about Jesus's limitations.

The ALJ explained that she credited Drs. Jhaveri's and Kareti's opinions because they were "well supported by explanation and by the medical evidence." (R. 29). The ALJ justifiably relied on the state-agency physicians' opinions in crafting an RFC. *See Rice*, 384 F.3d at 370. The ALJ also pointed out that the record does not contain any opinions from treating or examining physicians indicating that Jesus is disabled or even that he has limitations greater than those determined by the ALJ. *Id*. Jesus attacks the ALJ's finding that "the evidence submitted after [the

state agency] doctors rendered their opinions is mainly from the period after the claimant's date last insured, and, the evidence submitted after these doctors' opinions but before the date last insured does not document any significant changes or abnormalities." *Id.* Citing his prior argument relying on the *Parker* case, Jesus argues that the ALJ's reasoning is erroneous because "the ALJ must determine [his] limitations at the time of the hearing." Doc. 12 at 14. As explained earlier, the ALJ was not required to determine Jesus's limitations at the time of the January 2018 hearing and obtain a medical expert to estimate his condition in December 2015 where she determined directly that Jesus was not totally disabled by his DLI considering all relevant evidence, including the post-DLI evidence.

Finally, Jesus asserts that "the ALJ had a duty to obtain clarification when there are gaps in the evidence." Doc. 12 at 14. Specifically, Jesus contends that "given the absence of treatment source opinions and the sparse evidence during the nine-month relevant period, this would have necessitated the testimony of a medical expert" or "[a]t the very least, the ALJ should have, and could have, contacted any number of treating physicians for opinions." *Id.* This argument is completely without merit. "It was [Jesus's] burden, not the ALJ's to prove that []he was disabled." *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). While "the ALJ has a duty to develop a full and fair record," *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000), courts give "deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures . . . are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011); *Nicholson v. Astrue*, 341 F. App'x 248, 254 (7th Cir. 2009) ("the question before us is whether the ALJ's decision to rest on the record that he had was an abuse of discretion.); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) ("[I]t is always possible to do more. How

much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment.").

The ALJ did not abuse her discretion in this case. An ALJ's retention of a medical expert is discretionary and "there is no requirement that ALJs contact all treating physicians for disability opinions." *Migdalia v. Saul*, 414 F.Supp.3d 1126, 1137 (N.D. Ill., at *7 (N.D. Ill. Oct. 28, 2019); *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020) ("An ALJ *may* obtain a medical expert's opinion for several reasons including . . . 'to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing' and to determine the claimant's residual functioning capacity.") (emphasis added); *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007) ("ALJs *may* contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability.") (emphasis added). The record, as previously discussed, contained ample evidence, including multiple visits to doctors inside the relevant period and uncontradicted state agency physician opinions regarding Jesus's functional limitations caused by his impairments in combination for several years before the alleged amended onset date and for almost a year after the DLI, for the ALJ to determine Jesus's RFC. Besides *Parker*, the only case Jesus cites in support of this argument is *Nelms v. Astrue*, 553 F.3d 1093 (7th Cir. 2009), which is inapplicable because in that case the court held that the ALJ's duty to develop the record "is enhanced when a claimant appears without counsel." *Id*. at 1098. Here, Jesus was represented by the same attorney who represents him on this appeal, and his attorney never suggested at the administrative level that the ALJ should retain a medical expert or contact his treating physicians. "[B]ecause [Jesus] was represented by counsel at the hearing, she is presumed to have made her best case before the ALJ." *Summers*, 864 F.3d at 527; *Halsell v. Astrue*, 357 Fed. Appx. 717, 723 (7th Cir. 2009) ("[T]he ALJ was permitted

to assume that Halsell, who has always been represented by counsel, was 'making the strongest case for benefits,' so it was not improper for her to draw a negative inference from the fact that no treating physician opined that Halsell is disabled.").  Under these circumstances, the ALJ was not obligated to seek additional medical opinion evidence and reasonably determined that there was sufficient evidence in the record to assess Jesus's RFC.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [11] is denied, the Commissioner's Motion for Summary Judgment [20] is granted, and the ALJ's decision is affirmed.  The Clerk is directed to enter judgment in favor of the Commissioner and against the Plaintiff.

**SO ORDERED.**

Dated:  June 17, 2020

_____
Sunil R. Harjani
United States Magistrate Judge